BENJAMIN B. WAGNER
United States Attorney
KURT A. DIDIER
Assistant United States Attorney
GLEN F. DORGAN
Special Assistant United States Attorney
501 "I" Street, Suite 10-100
Sacramento, California 95814
Tel: (916) 554-2700  Fax:  (916) 554-2900

Attorneys for the Plaintiff UNITED STATES

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ARIA KOZAK and DONNA KOZAK,<br><br>                              Plaintiff,<br><br>v.<br><br>CHABAD-LUBAVITCH INC.; CHABAD OF CALIFORNIA; CHABAD RUNNING SPRINGS RESIDENTIAL CAMP; CHABAD CHEDER MENACHEM; YESHIVA OHR ELCHONON CHABAD; BAIS CHANA HIGH SCHOOL; CHABAD OF MARINA; and BAIS CHAYA MUSHKA,<br><br>                              Defendants. | CASE NO. 2:10-cv-01056-MCE-EFB<br><br>**UNITED STATES' TRIAL BRIEF**<br><br><br><br><br>Ctrm:  7<br>Judge: Hon. Morrison C. England, Jr.<br>Trial:   January 20, 2015 |

## I.  INTRODUCTION

This is an action for federal grant fraud.  The Department of Homeland Security funds, and the California Emergency Management Agency ("Cal EMA") administers, a grant program providing security upgrades to eligible nonprofit organizations in California.  The program, named the Urban Areas Security Initiative: Nonprofit Security Grant Program ("NSG Program"), was created to provide federal money to organizations, which because of their orientation, religious affiliation or identification, may face threats from individuals or entities hostile to the grantees' orientation or ideology.

After NSG Program grants are awarded, grantees are not immediately entitled to receive lump sum payments of grant funds. Instead, funds are advanced when project costs are incurred or anticipated, and grantees are required to adhere to strict rules for requesting and managing advances. Also, once a grantee receives an advance, the grantee must complete the authorized work (the "Performance Deadline") and pay its vendor for the work (the "Liquidation Deadline") within specified timelines. Grantees failing to meet these timelines are required to reimburse advanced grant funds to the United States.

The United States will establish at trial that Defendants CHABAD OF CALIFORNIA ("Chabad"), YESHIVA OHR ELCHONON CHABAD ("Yeshiva Ohr"), and CHABAD OF MARINA ("Marina") (collectively "Defendants")[1] violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, by knowingly making false representations and promises to collect NSG Program grant funds and then knowingly avoiding their obligations to repay grant funds that were misused.

## II. STIPULATED FACTUAL BACKGROUND

In preparation for trial, the parties stipulated to numerous facts and to the authenticity of grant documents. *See* Joint Statement of Undisputed Facts, Ex. "A" to Joint Final Pretrial Statement (Doc. #112-1). This stipulation establishes the following:

### A. Overview of the Grants.

In 2008, Defendants applied for five separate NSG Program grants to pay the costs of installing security upgrades at their various locations. Each grant was subject to the following Performance and Liquidation Deadlines:

| Grant | Grant Number | Performance Deadline | Liquidation Deadline |
|-------|--------------|---------------------|---------------------|
| Running Springs Grant | 2007-0023/037-90820 | December 31, 2009 | March 31, 2010 |
| Gayley Grant | 2008-0005/037-90820 | May 31, 2010 | August 30, 2010 |
| Yeshiva Ohr Grant | 2008-0005/037-90838 | May 31, 2010 | August 30, 2010 |
| Marina Grant | 2008-0005/037-90842 | May 31, 2010 | August 30, 2010 |
| Bais Chana Grant | 2008-0005/037-95062 | May 31, 2010 | August 30, 2010 |

Fact Nos. 1, 3-4, 6-7, 9-10, 13-14, 17. [2]

---

[1] Another defendant, BAIS CHANA HIGH SCHOOL ("Bais Chana"), has been defaulted, *see* Notice of Entry of Default (Doc. #48), but is identified herein as one of the "Defendants" for ease of reference.

[2] Each citation to a "Fact" is a reference to the facts enumerated in the parties' Joint Statement of Undisputed Facts, Ex. "A" to the Joint Final Pretrial Statement ("JFPS") (Doc. #112-1).

For each grant, Defendants' authorized representatives executed corresponding Grant Assurances. Fact Nos. 2, 5, 8, 11-12, 15-16. In their Grant Assurances, Defendants each agreed to (1) maintain financial management standards to provide for "[e]ffective control over and accountability for all funds" so that funds are "safeguard[ed]" and "used solely for authorized purposes," (2) develop "[w]ritten procedures to minimize the time elapsing between the transfer of funds to the [grantee] and the issuance or redemption of checks, warrants or payments by other means for program purposes by the [grantee]," (3) complete their grant projects and pay their vendors by the established deadlines, and (4) "promptly" repay any grant advances that were not properly paid out to vendors by the expiration of the deadlines. *See, e.g.,* Gayley Grant Assurances, Trial Ex. "29", paras. 5, 13, 16.o. (incorporating 28 CFR Part 70, commonly referred to as OMB Circular A-110);[3] 28 CFR §§ 70.21(b)(3), (5), 70.22(b), 70.71(d), 70.73(a). Simply stated, Defendants agreed to act as fiduciaries to protect grant advances for the benefit of the United States during any period that Defendants held advances prior to paying their vendors.

## B.  **Defendants' Grant Drawdowns**.

While Defendants applied separately for their own grants, they agreed in advance that Chabad would manage all of the grants through its President, Rabbi Boruch Cunin. Fact Nos. 18-19. In mid- to late-2009, Rabbi Cunin directed the Defendants to request, in the aggregate, $353,115 in grant drawdowns and to transfer their receipts to Chabad. Taking into account some minimal payments to vendors, Defendants collected $281,920 in grant advances, and $272,495 of this sum was held by Chabad:

| Grant | Gross Amount Grant Funds Requested/Received | Timely Vendor Payments | Advances Retained by Chabad | Advances Retained by Yeshiva Ohr and Marina |
|---|---|---|---|---|
| Running Springs Grant | $66,725 | $3,050 | $63,675 | $0 |
| Gayley Grant | $68,140 | $4,070 | $64,070 | $0 |
| Yeshiva Ohr Grant | $72,750 | $50,000 | $22,000 | $750 (Yeshiva Ohr) |
| Marina Grant | $72,750 | $14,075 | $50,000 | $8,675 (Marina) |
| Bais Chana Grant | $72,750 | $0 | $72,750 | $0 |
| **Sub-Total** | **$353,115** | **$71,195** | **$272,495** | **$9,425** |
| **Total** | | | **$281,920** | |

Fact Nos. 20-42.

---

[3] All references to a "Trial Ex." are references to the United States' exhibit list, Ex. "C" to the JFPS (Doc. #112-3). For ease of reference, and with one exception noted herein, the Trial Ex. numbers track the exhibit numbers used for purposes of the United States' motion for summary judgment (Doc. #78).

United States' Trial Brief

In 2009, Chabad owned two bank accounts with Comerica Bank ("the Comerica Accounts") that it used to hold ordinary income and pay regular operating expenses.  Chabad deposited the $272,495 in grant advances into the Comerica Accounts.  Fact Nos. 51-52.  Although Chabad received the funds well in advance of the grant Performance and Liquidation Deadlines, it nevertheless failed to use the grant funds to make timely payments to the vendors hired to install the security improvements.  For example, in mid- to late-2009, Chabad received $197,675 in grant funds for the express purpose of paying Elite Interactive Solutions, Inc. ("Elite") for the installation of security cameras within the scope of the Running Springs, Gayley and Yeshiva Ohr Grant Projects.  Fact Nos. 20-22, 26-30.  However, as of August 2010, Chabad had only paid $52,000 to Elite for its work.  Fact Nos. 38, 41-42, 45-48.  In early 2010, Chabad was named as a defendant in a state court lawsuit seeking damages for its failure to pay Elite.  Fact Nos. 43-44.  Several months later, after the Performance and Liquidation Deadlines had run, Chabad settled the lawsuit and began making payments.  Fact Nos. 45-48, 61-62.  The settlement payments were not completed until late 2011.  Fact Nos. 61-62.

Concerning the Marina Grant and Bais Chana Grant Projects, Chabad collected an additional $131,425 in grant funds for the express purpose of paying Elite.  Fact Nos. 23-24, 31-35.  However, Chabad never paid Elite, because no security cameras were ever installed at the facilities used by Marina and Bais Chana.  Fact Nos. 49-50.  On July 14, 2014, over four years after this *qui tam* action was initiated, Chabad finally returned these funds to the United States.  Fact No. 57.[4]

Regarding Yeshiva Ohr and Marina, the Defendants simply kept their $9,425 grant advances for their own purposes and never used the funds to pay vendors.  *See* Fact No. 59.

## III. UNITED STATES' CAUSES OF ACTION, EVIDENCE AND LEGAL AUTHORITY

The United States asserts three separate causes of action for violation of the False Claims Act and a fourth cause of action for unjust enrichment.  The United States' unjust enrichment claim is established beyond dispute based on the stipulated evidence that demonstrates the Defendants' breach of the NSG

---

[4] The total tender was $136,920, which included the $131,425 in grant funds for Marina and Bais Chana as well as (1) $675 that was received but never used to pay vendors on the Running Springs Project, $4,070 that was received but never used to pay vendors on the Gayley Project, and (3) $750 that was received but never used to pay vendors on the Yeshiva Ohr Project.

Program terms and conditions.  *See Lectrodryer v. Seoulbank*, 77 Cal.App.4th 723, 726 (Cal.Ct.App. 2000) ("the elements for a claim of unjust enrichment [are] receipt of a benefit and the unjust retention of the benefit at the expense of another").  On this claim, the United States is entitled to a judgment in the amount of $281,920 (the sum of all mismanaged advances received by Defendants) plus interest as authorized under 31 U.S.C. § 3717 and California Civil Code §§ 3287, 3288.

At trial, the United States will introduce additional evidence that establishes that Defendants also violated the False Claims Act by engaging in fraud to secure and retain their grant funds.

### A.    First Cause of Action:  Violation of 31 U.S.C. § 3729(a)(1)(A)-(B).

The False Claims Act imposes liability for defrauding the United States through the submission of false claims seeking receipt of federal funds. 31 U.S.C. § 3729(a)(1)(A)-(B).  A cause of action for violation of 31 U.S.C. § 3729(a)(1)(A) requires "(1) a false or fraudulent claim (2) that was material to the decision-making process, (3) which defendant presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent."  *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012).  Similarly, a claim predicated on Section 3729(a)(1)(B) requires a showing that "defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim."  *Id*.

A "claim" under the Act is defined broadly to include "any request or demand" for federal funds. 31 U.S.C. § 3729(b)(2).  Both the Grant Assurances (submitted in the context of the grant applications) and the drawdown requests (advising Cal EMA on grant payments to vendors) were "claims" within the scope of this broad definition because Defendants' representations in these documents triggered the payment of grant funds.  *See United States ex rel. Bauchwitz v. Holloman*, 671 F.Supp.2d 674, 689 (E.D.Pa. 2009) (held an initial grant application and subsequent grant progress reports constitute claims, because the documents are each prerequisites to the release of funding).

"The principles embodied in [the Act's] broad construction of a 'false or fraudulent claim' have given rise to two doctrines that attach potential False Claims Act liability to claims for payment that are not explicitly and/or independently false:  (1) false certification (either express or implied); and (2) promissory fraud."  *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006).  The United States will introduce evidence at trial supporting the application of both doctrines.

United States' Trial Brief

5

1. **False Certification**.

It is undisputed that Defendants falsely certified their compliance with the financial management standards required by OMB Circular A-110 as codified at 28 CFR Part 70.  On the date that Rabbi Cunin executed the Grant Assurances for the Running Springs Grant and the Gayley Grant, Chabad had no policies in place to ensure "[e]ffective control over and accountability for all funds," and "to minimize the time elapsing between the transfer of funds to the recipient from the U.S. Treasury and the issuance or redemption of checks, warrants or payments" to grant project vendors.  *See* Chabad RFA 2, Trial Ex. "6," Request No. 16; *see also* 28 CFR § 70.21(3), (5).  When Rabbi Cunin executed the grant drawdown requests for the Running Springs and Gayley Grant Projects, he again falsely certified Chabad's compliance with the grant requirements.  These undisputed false certifications fit within the ambit of the False Claims Act.  *See Siebert v. Gene Sec. Network, Inc.*, 2013 WL 3052882, *3-5 (N.D.Cal. June 17, 2013) (allegations that defendant "falsely certified its compliance with financial system requirements during the NIH grant application process" and "violated the FCA each time it accepted NIH funds by reaffirming its compliance" held "sufficient to satisfy the falsity requirement").

Similarly, when Yeshiva Ohr, Marina and Bais Chana executed their Grant Assurances and drawdown requests, they also misrepresented their compliance with OMB Circular A-110's financial management standards.  *See* Yeshiva Ohr RFA, Trial Ex. "7," Request No. 24.[5]

The United States will introduce evidence through witnesses from Cal EMA that Defendants' certification of compliance with the financial management standards was material.  The term "material" is defined in the False Claims Act as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); *see Hendow*, 461 at 1172 (9th Cir. 2006) ("the question is merely whether the false certification . . . was relevant to the government's decision to confer a benefit").  Simply stated, Cal EMA would not have approved the grant drawdown

///

---

[5] Marina was the only defendant to respond to the United States' requests for admissions, and Marina denied that it failed to comply with the NSG Program's financial standards.  However, the United States will introduce evidence at trial that Marina intended at the time it requested the grant advances to forward those advances to Chabad.  Because Chabad did not have the requisite standards, Marina acted recklessly in falsely certifying compliance with the standards.

requests had it known that Defendants intended to transfer all funds to Chabad and that Chabad had no policies in place to safeguard the grant advances.

To establish liability under the False Claims Act for a "knowing" submission of a false claim, "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1)(B). Instead, the Act defines "knowing" broadly to include "deliberate ignorance" or "reckless disregard." 31 U.S.C. § 3729(b)(1)(A). The undisputed evidence in this case demonstrates Defendants' recklessness and deliberate ignorance in three respects. First, the falsity of Defendants' express certifications—continually promising that policies were in place to safeguard grant funds when no such policies existed—is objectively obvious. Given the "clarity of the falsity," there can be no dispute that Defendants acted recklessly. *See United States v. Raymond & Whitcomb Co.*, 53 F.Supp.2d 436, 447 (S.D.N.Y. 1999) ("The clarity of the falsity supports the United States' position that a failure to know of the falsity was at least reckless"); *see also, United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997).

Second, Defendants were told the grant money must be used only for the intended purpose and used within strict deadlines. Chabad hired David Sternlight, Ph.D. ("Dr. Sternlight") in or about 2008 as a consultant to assist Rabbi Cunin with the NSF Program. Dr. Sternlight underwent training on the administrative requirements of the NSG Program and told Chabad what was required. Nevertheless, Defendants ignored Dr. Sternlight's professional advice. For example, in October 2009, during the period that Defendants were submitting drawdown requests to Cal EMA, Dr. Sternlight expressly warned Rabbi Cunin that Chabad would have a limited period to complete the projects and pay vendors with grant advances. *See, e.g.,* Fact Nos. 53-55. Rabbi Cunin deliberately ignored this warning.

Finally, Defendants' conduct in the context of a Cal EMA audit demonstrates that they knowingly submitted drawdown requests based on false certifications. In April 2010, Cal EMA notified Defendants that it was conducting a field review of their NSG Program grants, and Cal EMA demanded that Defendants produce all "Fiscal/Administrative Policies" or, alternatively, "describe the procedures your organization uses to ensure control over and accountability for grant funds." Fact No. 56. The evidence will show that Defendants produced a letter response in June 2010 that stated, "All entities have adopted *OMB Circular A-110 Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations*, as their respective policies on

fiscal/administrative and procurement procedures." *See* June 2010 Letter, Trial Ex. "41." By referencing OMB Circular A-110, Defendants admit they knew their participation in the NSG Program was subject to strict financial standards. This admission is further evidence that Defendants acted knowingly when they failed to implement the control and accountability procedures required by the Circular and falsely certified their compliance with these financial standards.

In a false certification case, the measure of damages is the difference between the amounts the United States paid over and above what it would have paid if the certification had been truthful. *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966). Had the United States, acting through Cal EMA, been aware that (1) Defendants had no policies in place to safeguard grant funds, and (2) Defendants had arranged for the transfer of all grant funds to Chabad, no grant advances would have been awarded to Defendants. The single damages arising from Defendants' misconduct, therefore, total $345,065, the sum of all grant advances paid based on the false certifications. *See* Fact Nos. 26-35 (identifying $353,115 in total grant funds requested and received), Fact Nos. 20, 36-37 (identifying $8,050 in vendor payments that pre-dated the drawdown requests) ($353,115 - $8,050 = $345,065).

Pursuant to 31 U.S.C. § 3729(a)(1), the imposition of treble damages is mandatory. Accordingly, the damages in this case total $1,035,195 ($345,065 x 3 = $1,035,195). Of this sum, Chabad is independently liable for $401,445 in treble damages for its own false claims submitted on the Running Springs and Gayley Grants, and Chabad is jointly and severally liable with Yeshiva Ohr for $218,250 arising out of the Yeshiva Ohr Grant; with Marina for $197,250 arising out of the Marina Grant; and with Bais Chana for $218,250 arising out of the Bais Chana Grant.

In addition to treble damages, the False Claims Act mandates a civil penalty between $5,500 and $11,000 for each violation. 31 U.S.C. § 3729(a)(1); *see* 28 CFR § 85.3(a)(9). Civil penalties under the False Claims Act are mandatory upon a finding that false claims were submitted to the United States. *In re Schimmels*, 85 F.3d 416, 419 (9th Cir. 1996); *United States ex rel. Rosales v. San Francisco Housing Authority*, 173 F.Supp.2d 987, 1019 (N.D.Cal. 2001) ("In providing for treble damages and mandatory penalties under the FCA, Congress intended a complex mix of compensation, punishment and deterrence"). The United States, therefore, will ask for the imposition of five separate penalties, each in

///

1   the amount of $11,000 and totaling $55,000 in the aggregate, against Chabad; one penalty in the amount

2   of $11,000 against Yeshiva Ohr; and one penalty in the amount of $11,000 against Marina.

3           **2.**    **Promissory Fraud**.

4         "Rather than specifically requiring a false statement of compliance with government regulations,"

5   the promissory fraud doctrine is "broader" and "holds that liability will attach to each claim submitted to

6   the government under a contract, when the contract or extension of government benefit was originally

7   obtained through false statements or fraudulent conduct." *Hendow*, 461 F.3d at 1173.  Here, Defendants

8   made promises in the context of the grant program that they did not intend to keep, and their conduct

9   exposes them to liability under the False Claims Act.  *See Id.* at 1174.

10        The evidence will show that Chabad was in the midst of a severe financial crisis in mid- to late-

11  2009.  In 2005, Chabad purchased its Running Springs property, and, by 2009, Chabad had incurred net

12  losses of over $4 million associated with the operation of the property.  To counter the losses, Chabad

13  secured multiple loans from private parties, and, in 2009, Chabad's lenders began to issue demands for

14  full repayment.  By late 2009, Chabad defaulted on one of its loans in the amount of $1.2 million and

15  foreclosure proceedings were initiated. Additionally, Chabad was named as a defendant in several

16  lawsuits alleging Chabad's failure to pay debts as they came due.  For example, in early 2010, a law firm

17  previously retained by Chabad filed a petition seeking to compel arbitration over the firm's claim that

18  Chabad owed over $184,000 in legal fees dating back to 2008.

19        It was during this period that Chabad submitted, and caused the other Defendants to submit,

20  drawdowns seeking over $350,000 in grant funds.  The evidence will show that Chabad overstated its

21  anticipated grant costs in some of the drawdown requests.  For example, though Elite never commenced

22  work at Marina's facilities, Elite issued a proposal in August 2009 estimating the costs for the work at

23  $53,500.  *See* Proposal [CH000175], attached to June 1 Letter, Trial Ex. "41."  After taking into account

24  $14,075 in fencing installed at Marina's facilities, a total of $58,675 remained available under the Marina

25  Grant.  *See* Fact Nos. 23, 37, 39.  Thus, if Chabad intended to complete the grant project, it needed to

26  request only $53,500—the amount stated in Elite's proposal—to pay Elite's anticipated costs, and Chabad

27  would have had no need to claim the remaining $5,175 in grant funds ($58,675 - $53,500 = $5,175).

28  Chabad's true intention, however, was to maximize its receipt of funds in order to mitigate its ongoing

financial problems.  Accordingly, Chabad submitted a claim in which it falsely represented that Elite's costs were $58,675.  *See* Fact No. 23.

The evidence will also show that, as of late October 2009 when Chabad submitted drawdown requests seeking funds to pay Elite for work on the Marina and Bais Chana Projects, Chabad was already embroiled in a dispute with Elite concerning Chabad's failure to pay for work on the other projects.  For example, on October 14, 2009, Aria Kozak, the owner of Elite, emailed Chabad to state:

> Knowing that Chabad has been funded by Homeland Security and continued to string me along for 4 months after all I have done is unacceptable [and] I must cease all work on the projects [unless] a minimum of $38,000 [is paid] today to keep things afloat.

Email [US002436], Trial Ex. "66."[6]

Chabad did not make the payment demanded by Elite.  Instead, notwithstanding Elite's clear indication that it would not proceed with additional projects, Chabad submitted the drawdowns for Bais Chana and Marina on October 27 and 29, 2014, and Chabad misrepresented in the drawdown requests that the costs for Elite's work would be incurred as early as December 2009.  Fact Nos. 23-24; *see, e.g.,* Bais Chana Drawdown, Trial Ex. "40."

Finally, the evidence will show that Chabad misappropriated the vast bulk of advances by converting the funds to its own uses to pay non-grant debts.  At trial, the United States will present testimony from its retained economist, Karl Erik Volk, M.A., who reviewed the Comerica Account records for the purpose of tracing the deposits of grant funds received by Chabad.  Mr. Volk will testify that over $272,000 in funds deposited into the Comerica Accounts was misappropriated between July 2009 and April 2010.  Indeed, Mr. Volk's analysis demonstrates that Chabad's non-grant expenses often exceeded all sources of income, including the grants, resulting in negative balances.  On July 16, 2009, for example, Chabad received and deposited $63,675 in advances.  While the advances were issued for the purpose of paying Elite, all of the funds were gone by the end of that day, and the combined closing balance for the Comerica Accounts was -$5,408.94.  *See* Volk Report, Trial Ex. 48.

///

///

---

[6] This email is not included with the exhibits submitted in support of the motion for summary judgment.

Because the calculation of damages for Defendants' promissory fraud is identical to the calculation of damages for their false certifications, the treble damages total $1,035,195 and include the imposition of mandatory penalties.

**B.     Second Cause of Action:  Violation of 31 U.S.C. § 3729(a)(1)(G).**

Any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" is liable under the False Claims Act. 31 U.S.C. § 3729(a)(1)(G).  An "obligation" is defined to include an "established duty, whether or not fixed, arising from an express or implied contractual [or] grantor-grantee . . . relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

In May 2009, Congress amended the False Claims Act to include "the retention of any overpayment" within the definition of an "obligation" in order to "prevent Government contractors and others who receive money from the Government incrementally based upon cost estimates from retaining any Government money that is overpaid during the estimate process." S. Rep. No. 111-10, at 15 (2009), reprinted in 2009 U.S.C.C.A.N. 430; *see United States ex rel. Yannacopoulos v. General Dynamics*, 636 F.Supp.2d 739, 751-52 (N.D.Ill. 2009) (noting amendment).  Accordingly, "any knowing and improper retention of an overpayment beyond or following the final submission of payment . . . would be actionable under this provision."  *Id*. at 15.  Here, Defendants "receive[d] money from the Government incrementally based on cost estimates" and knowingly retained overpayments of grant funds in violation of the NSG Program terms and conditions and the False Claims Act.

The United States will introduce evidence that Defendants received overpayments of grant advances totaling, in the aggregate, $281,920.  *See* Chart, pg. 3, *supra*.  For the Running Springs, Gayley and Yeshiva Ohr Grants, Chabad was overpaid $149,745 and Yeshiva Ohr was overpaid an additional $750.  For the Marina and Bais Chana Grants, Chabad was overpaid $122,750 and Marina was overpaid an additional $8,675.  Under the NSG Program terms, these overpayments became a federal debt, and Defendants were obligated to pay this debt "promptly."  *See* 28 CFR §§ 70.71(b), (d), 70.73(a) ("Any funds paid to a recipient in excess of the amount to which the recipient is finally determined to be entitled under the terms and conditions of the award constitute a debt to the Federal Government").

By its own admission, Chabad's failure to reimburse the overpayments was intentional.  Rabbi

1   Cunin testified at his deposition, "I can make it quite clear, so you can understand me:  The only money I

2   ever intended to repay the government is the money from Bais Chana.  Nothing else."  Cunin Transcript,

3   256:9-257:17.  When asked why he refused to repay the Bais Chana funds, Rabbi Cunin admitted that his

4   plan was to hold those funds as leverage to secure a resolution of all claims.  *Id.* [7]

5          The measure of damages for a knowing retention of an overpayment is the difference between the

6   amount of the debt owed and the amount that was actually paid by the defendant.  *See United States v.*

7   *Bourseau*, 531 F.3d 1159, 1172 (9th Cir. 2008).  Because Defendants refused to timely reimburse the

8   grant overpayments, the measure of damages is the total sum of the overpayments, or $281,920.  Because

9   the imposition of treble damages is mandatory, Defendants' total liability is $845,760.  31 U.S.C. §

10  3729(a)(1).  Of this sum, Chabad is jointly and severally liable with Yeshiva Ohr ($22,000 x 3 =

11  $66,000), with Marina ($50,000 x 3 = $150,000) and Bais Chana ($72,750 x 3 = $218,250).  Separately,

12  Chabad is independently liable for the debts arising out of the Running Springs Grant ($63,675 x 3 =

13  $191,025) and the Gayley Grant ($64,070 x 3 = $192,210); Yeshiva Ohr is independently liable for a

14  portion of the debt on the Yeshiva Ohr Grant ($750 x 3 = $2,250); and Marina is independently liable for

15  a portion of the debt on the Marina Grant ($8,675 x 3 = $26,025).

16          Defendants are also liable for mandatory penalties.  31 U.S.C. § 3729(a)(1).  Here, Chabad has

17  improperly avoided five separate debts arising out of five separate grants.  The United States, therefore,

18  will seek five separate penalties of $11,000, totaling $55,000.  Additionally, the United States will seek

19  one penalty in the amount of $11,000 against Yeshiva Ohr and one penalty in the amount of $11,000

20  against Marina for their wrongful avoidance of the debts arising out of their grants.

21          **C.**     **Third Cause of Action:  Violation of 31 U.S.C. § 3729(a)(1)(C)**.

22          Any person who "conspires to commit a violation" of the False Claims Act is liable for treble

23  damages and penalties.  31 U.S.C. § 3729(a)(1)(C).  "The essence of a conspiracy is an agreement

24  between parties to commit a wrongful act."  *See* Claire M. Sylvia, The False Claim Act: Fraud Against the

25

26  [7] As noted above, Chabad later tendered payment (albeit only a partial payment) of $136,920 in July
    2014.  Fact No. 57.  Because Chabad's tender is unconditional, the tender operates as an additional
27  admission that it failed to timely reimburse overpayments of grant funds for each of the five grants.  *See*
    *Barringer v. Prudential Ins. Co. of America*, 62 F.Supp. 286 (E.D. Pa. 1945) ("unqualified tender
28  amounts to an acknowledgment that the money tendered is absolutely due").

Government § 4:5 (April 2014).  Accordingly, a claim under Section 3729(a)(1)(C) requires proof that the defendants (1) entered into an agreement to engage in one or more acts in violation of the False Claims Act, and (2) one or more of the co-conspirators performed an act to get a false or fraudulent claim allowed or paid.  *Id.*; *see United States ex rel. Repko v. Guthrie Clinic, P.C.*, 557 F.Supp.2d 522, 527-28 (M.D.Pa. 2008).

While Defendants each applied individually for their NSG Program grants, it is undisputed that, in advance of seeking their drawdowns, Defendants entered into agreements to funnel the grant funds to Chabad.  Fact No. 18.  For its part, Cal EMA was unaware of the agreement and distributed the grant advances based on the Defendants' individual representations that they would each manage their own grants.  Indeed, had Cal EMA known of the agreement, it would have likely refused to issue the grants, because the NSG Program terms expressly provided that "[a]ward amounts to nonprofit organizations shall not exceed $75,000."  *See* California Supp., Trial Ex. "34," p. 7 [US000043].  At a minimum, Cal EMA would have held Chabad to even more restrictive financial standards.  *See, e.g.,* 28 CFR §70.22(k) (recipients receiving in excess of $120,000 in grant funds must "maintain . . . interest bearing accounts"). By their very terms, therefore, the purpose of Defendants' secret agreement was to defraud Cal EMA so that Chabad would receive more funds than it would otherwise be entitled.

Defendants each performed acts in furtherance of their unlawful agreement.  Accordingly, they are each jointly and severally liable for total damages of $1,035,195, or treble the amount of grant funds ($345,065) issued as a result of the fraud, plus mandatory civil penalties.

## IV.  CONCLUSION

The United States is ready for trial on January 20, 2015, on the claims summarized above.

Date:  November 20, 2014                    Respectfully submitted,

                                           BENJAMIN B. WAGNER
                                           United States Attorney

                                       By  /s/ Glen F. Dorgan
                                           GLEN F. DORGAN
                                           Special Assistant United States Attorney