1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA ex rel.       No.  2:10-cv-01056-MCE-EFB
      ARIA KOZAK and DONNA KOZAK
12
                   Plaintiff,
13                                            **MEMORANDUM AND ORDER**

14          v.

15    CHABAD-LUBAVITCH INC.; CHABAD
      OF CALIFORNIA; CHABAD RUNNING
16    SPRINGS RESIDENTIAL CAMP;
      CHABAD CHEDER MENACHEM;
17    YESHIVA OHR ELCHONON CHABAD;
      BAIS CHANA HIGH SCHOOL;
18    CHABAD OF MARINA; and BAIS
      CHAYA MUSHKA,,
19
                   Defendants.
20

21          In April of 2010, Relators Aria and Donna Kozak initiated this qui tam action on

22    behalf of the United States, alleging that Defendant Chabad of California ("Chabad"),

23    along with various other entities affiliated with Chabad and also named as defendants,

24    misappropriated federal grant funds made available for security upgrades at Chabad-

25    owned facilities and then concealed the obligation to repay those funds.  The lawsuit

26    was instituted under the auspices of the federal False Claims Act, 31 U.S.C. § 3729 et

27

28
                                              1

seq. ("FCA").  On October 9, 2012, the United States filed its election to intervene in this

case, ECF No. 27, and on December 5, 2012, the Government filed the operative First

Amended Complaint ("FAC"), ECF No. 33. The FAC named Chabad and seven other

Chabad-related entities as Defendants.  Entry of default has been entered against two,

Bais Chana High School ("Bais Chana") and Chabad-Lubavitch, Inc.  ECF No. 48.  A

third, Chabad Cheder Menachem, was dismissed at the Government's request on July

30, 2013, ECF No. 53, and the Government has represented it anticipates that Bais

Chaya Mushka will be voluntarily dismissed.  Pl.'s Mot., ECF No. 78-1 at 9:9-10, n.2.

With respect to Defendant Chabad Running Springs Residential Camp, the parties have

stipulated that this Defendant is not a separate entity but instead is a fictitious business

name owned and operated by Chabad.  See ECF No. 52, 7:20-27.  For all practical

purposes, then, three Defendants remain:  Chabad, Yeshiva Ohr Elchonon Chabad

("Yeshiva Ohr"), and Chabad of Marina ("Marina") (collectively "Defendants").

Through the Motion for Summary Judgment ("Motion") now before the Court, ECF

No. 78, the Government requests that this Court find as a matter of law that Chabad,

Yeshiva Ohr, and Marina have violated the FCA and enter judgment against them and in

favor of the United States.  Each of the Defendants filed separate papers opposing the

Motion.  For the reasons set forth below, the Court grants the Motion as to Chabad, but

finds that triable issues of material fact preclude judgment against either Yeshiva Ohr or

Marina.[1]

///

///

///

---

[1] Because oral argument was not deemed to be of material assistance in deciding this matter, the Court ordered the matter submitted on the briefs in accordance with Local Rule 230(g).

2

1

2

## BACKGROUND

3   The Urban Areas Security Initiative: Nonprofit Security Grant Program ("NSG

4   Program") provides federal funding through the Department of Homeland Security

5   ("DHS") to pay for security upgrades needed by eligible nonprofit organizations.  The

6   DHS administers the NSG Program in California through the California Emergency

7   Management Agency ("Cal EMA").

8   Chabad is part of the Chabad-Lubavitch movement, a branch of Hasidic and

9   Orthodox Judaism.  Chabad institutions provide cultural and educational activities at

10   Chabad-run community centers, synagogues, schools, and camps.  According to

11   Chabad, Yeshiva Ohr, Marina and Chabad itself are independent entities financed by

12   voluntary contributions.  Chabad, however owns the physical facilities used by both

13   Marina and Yeshiva Ohr.

14   It is undisputed that in 2008, Chabad applied for NSG Program funding in order to

15   install video surveillance and other security equipment at facilities located in Running

16   Springs and Los Angeles, California.  Pl.'s Statement of Undisputed Fact ("SUF"), ECF

17   No. 78-2, Nos. 1, 4.[2]  It is further undisputed that Chabad subsequently received grants

18   in the amount of $97,000.00 and $72,750.00 respectively, for those facilities.

19   Performance periods expiring on December 31, 2009 and May 31, 2010 were

20   established for those two grants.  Id. nos. 3, 6.

21   Yeshiva Ohr and Marina also applied for NSG grants and were notified by Cal

22   EMA in late 2008 that their applications were approved in the amount of $72,750.00

23   each; performance periods ending on May 31, 2010, were established in both

24   instances.[3]  Id. nos. 7, 9.

---

25

26   [2] As used subsequently in this Memorandum and Order, "SUF" refers to the Statement of
Undisputed Facts submitted with respect to the Government's Motion as against Chabad.  Any references
27   to undisputed facts submitted as to Defendants Yeshiva Ohr and Marina will be separately designated.

28   [3] It appears that defaulted Defendant Bais Chana received a separate $72,750.00 grant with a
May 31, 2010, performance deadline.

1    As a condition to participating in the NSG Program, it is uncontroverted that

2    Defendants executed grant assurances agreeing to be bound by and comply with the

3    provisions set forth in several directives, including  the so-called "OMB Circular A-110"

4    (as codified by 28 C.F.R. part 70 ) along with other federal and state guidance materials.

5    Id. nos. 13-16.  Chabad's  authorized representative, Rabbi Boruch Shlomo Cunin

6    ("Rabbi Cunin") executed the grant assurance on behalf of Chabad, while  Rabbi Danny

7    Yiftach-Hashem provided the necessary assurances on behalf of both Yeshiva Ohr and

8    Marina. Id. nos. 8, 10.  Finally, Rabbi Aharon Begun executed the assurance for Bais

9    Chana.  Id. no. 12.  Collectively, the assurances and the documents they referenced

10   required Defendants to comply with specific financial management standards that would

11   both safeguard the integrity of any grant payments made.  They also required the return

12   of any overpaid grant funds not used for authorized expenses by the particular deadlines

13   imposed with respect to each grant.

14   Approval of the grant applications to Chabad, Yeshiva Ohr, and Marina did not

15   mean they were immediately entitled to a lump sum payment equivalent to the amount

16   approved.  Instead, grant funds were intended to be released over time as project costs

17   were either incurred or anticipated.  In seeking the release of funds, Defendants had the

18   option of either paying the vendors providing the security improvements and then

19   seeking a drawdown of grant funds as reimbursement, or instead seeking an advance of

20   grant funds that could be used to pay the vendors directly.  28 C.F.R. §§ 70.2(d),

21   70.22(b), (e).

22   The governing regulations permit grant advances, as opposed to reimbursement

23   requests, only if recipients agree to comply with strict financial management standards:

24       Recipients may be paid in advance, providing they maintain
         or demonstrate the willingness to maintain written procedures
25       that minimize the time elapsing between the transfer of funds
         and disbursement by the recipient, and financial management
26       systems that meet the standards for fund control and
         accountability as established in § 70.21.  Cash advances to a
27       recipient organization will be limited to the minimum amounts

28

4

> 1
> 2
> 3
> 4

needed and be timed to be in accordance with the actual, immediate cash requirements of the recipient organization in carrying out the purpose of the approved program or project. The timing and amount of cash advances must be as close as is administratively feasible to the actual disbursements by the recipient organization for direct program or project costs and the proportionate share of any allowable indirect costs.

28 C.F.R. § 70.22(b); see also 28 C.F.R. § 70.22(e).  Pursuant to 28 C.F.R. § 70.21(b)(3), a grantee's "financial management systems" must provide for "[e]ffective control over and accountability for all funds, property and other assets," and "[r]ecipients must adequately safeguard all such assets and assure they are used solely for authorized purposes."

As the Government points out, these strict financial management standards serve two important purposes.  As one of the documents encompassed by the grant assurances, the Office of Justice Program's 2006 Financial Guide ("OJP Guide"), makes clear, the standards enforce the grant recipient's status as a "fiduciary" with the "responsibility to safeguard grant funds and ensure funds are used for the purposes for which they were awarded."  OJP Guide, Decl of Glen Dorgan, ECF No. 79, Ex. 35, Forward, p. iii.  In addition, the standards also discourage grantees from holding federal funds for extended periods, since "idle funds in the hands of subrecipients will impair the goals of cash management."  Id. at 37-38.

Moreover, the performance deadlines imposed with respect to each of the grants, as set forth above, require that before the expiration date the grantee must "obligate" grant funds by hiring a vendor to install the security improvements specified in the grant project.  28 C.F.R. § 70.2(u), 70.28.  Then, a grantee must "liquidate" grant funds by paying vendors no later than 90 days following the performance deadline.  28 C.F.R. § 70.71(b).  Should a grantee fail to comply with these deadlines, it becomes automatically indebted to the United States and must "promptly" repay advances to the United States through Cal EMA.  28 C.F.R. §§ 70.2(nn), 70.71(d), 70.73(a).

Although, as indicated above, Yeshiva Ohr, Marina and Bais Chana were, and remain, separate entities, Chabad owned the facilities used by these entities and, as a

5

1   result, took over full management of the grant projects designed to increase security at

2   each physical facility.  See Yiftach-Hashem Dep., ECF No. 79-2, Ex. 16 to Dorgan Decl.,

3   25:20-27:23.  It is undisputed that Marina, Yeshiva Ohr, and Bais Chana each agreed in

4   advance that 1) Chabad would have sole responsibility for selecting, supervising, and

5   paying the vendors hired to perform the security improvements; 2) Chabad would direct

6   the timing of all advance drawdown requests against the grants; and 3) that all grant

7   funds received would be transferred to, held, and managed by Chabad.  SUF, ECF No.

8   78-2, no. 17.  As Rabbi Yiftach-Hashem (also known as Jan Yeftadonay), the authorized

9   representative of both Marina and Yeshiva Ohr, explained during his deposition, "the

10  overall plan" was that "Chabad of California would orchestrate everything."  Yiftach-

11  Hashem Dep., ECF No. 79-2, Ex. 16 to Dorgan Decl., 27:16-19.  Chabad, for its part,

12  entrusted one individual, Rabbi Cunin, with sole responsibility for determining when to

13  seek grant drawdowns, when to pay vendors, and how to manage all Cal EMA grant

14  advances.  SUF, ECF No. 78-2, no. 17.  The Government was neither informed nor

15  aware of these arrangements. Id. no. 49.

16       The Government asserts that Chabad had no written financial management

17  procedures to regulate use of grant funding despite the fact, as set forth above, that they

18  had assured the Government that they had such procedures in place 1) to provide

19  control over and accountability for all funds received under the NSG Program; and 2) to

20  adequately safeguard all such funds and to assure they were used solely for authorized

21  purposes. Id. no. 48.[4]

22       That assertion is amply supported by the record.  First, Chabad's bank records

23  show that grant monies were not segregated so that they would be used only for

24  approved grant purposes.  On May 28, 2009, and July 28, 2009, Chabad submitted two

25  claims to Cal EMA seeking advance drawdowns of $66,725.00 and $68,140.00 from the

26  monies awarded for security upgrades at its Running Springs and Gayley facilities.  Id.

27       [4] While Chabad takes issue with this statement on grounds that it in fact "adopted" Circular OMB
28  1-110, as set forth in more detail below the facts belie any assertion that even if the Circular was adopted,
    it was ever complied with as its provisions require.

1   nos.19-20.  Advances in those amounts, which totaled $134,865.00, were received by

2   Chabad on July 16, 2009, and September 9, 2009.  Id. nos. 25-26.  Those funds  were

3   then deposited into two Chabad accounts with Comerica Bank used to hold money

4   received from all sources and to pay Chabad's regular operating expenses, including

5   employee payroll, building repairs, mortgages, and utility expenses.  Id. nos. 52-53.

6   Thus, the funds were  not segregated for use in accordance with the NSG Program and,

7   by October 16, 2009, it is undisputed that Chabad used $127,745.00 for non-grant

8   purposes.  Id. nos. 54-55.

9           With regard to Bais Chana, it is undisputed that on October 27, 2009, Chabad

10   also submitted a claim to Cal EMA on Bais Chana's behalf seeking a drawdown in the

11   full grant amount of Bais Chana's $72,750.00 award. Id. no. 23.  That amount was

12   received by Bais Chana on or about December 21, 2009, and was subsequently

13   transferred to Chabad, which deposited it in a Comerica account and used it for non-

14   grant purposes.  Id. nos. 31-32, 58.

15           Yeshiva Ohr similarly transferred $72,000.00 of the grant funds it received to

16   Chabad in two installments of $40,000 and $32,000.00 on November 23, 2009, and

17   December 15, 2009, respectively.  Id. no. 27.  Chabad subsequently transferred the

18   entire $72,000.00 it received from Yeshiva Ohr into one of its accounts with Comerica.

19   Id. no. 28.  It is undisputed that Chabad subsequently withdrew $22,000.00 of those

20   monies for non-grant purposes.  Id. no. 56.

21           The same pattern of requesting drawdown requests and depositing much if not all

22   of the funds received into Chabad's Comerica accounts (used for general operating

23   expenses) continued with respect to Marina.  On December 17, 2009, after Cal EMA

24   provided the entire $72,750.00 grant award to Marina, Marina transferred $50,000.00 of

25   those funds to Chabad, and Chabad thereafter deposited those funds in a Comerica

26   account and used the money for non-grant purposes.  Id. nos. 29-30, 57.

27           Significantly, all the advance drawdown requests outlined above were made

28   either by Chabad directly for its own grants or indirectly as to the requests Chabad made

7

1   on behalf of its affiliates.  In addition to the grant assurances made to safeguard grant

2   funds at the time initial grant applications were tendered, Chabad recertified those

3   assurances when it sought grant advance drawdowns both for itself and for its affiliates. .

4   Id. no. 24.

5           Second, even aside from the fact that the funds themselves were not specially

6   earmarked for grant use as the Government had been assured, it is undisputed that

7   contemplated security improvements were not made before the end of the performance

8   period, contractors were not paid for work they did perform, or both.  Taking into account

9   advances paid in the amount of $353,115.00, and given disbursements in the amount of

10  $21,195.00 that had already been made by the time the advance payments were made,

11  together with advance funds totaling $9,425.00 that were retained by Yeshiva Ohr and

12  Marina for other purposes, Chabad was responsible for a net amount of $322,495.00

13  received that had to be obligated and paid before the various grant performance

14  deadlines expired.   Id. nos. 33-37; Yeshiva Ohr SUF, ECF No. 78-4,no. 13; Chabad of

15  Marina SUF, ECF No. 78-3, nos. 11-12, 15-16.-

16          Of this net $322,495.00 figure which had to be obligated and paid before the end

17  of the various performance periods, the evidence shows that only two additional

18  payments were made in November and December of 2009 totaling $50,000.000 to Elite

19  Interactive Solutions ("Elite"), the vendor hired to install security cameras at Yeshiva's

20  Ohr's facilities.  SUF, ECF No. 78-2, nos. 38-39; Yeshiva Ohr SUF, ECF No. 78-3, nos.

21  20-21.  The remaining balance of $272,495.00 was not paid within 90 days following the

22  specified performance periods, the last of which expired on May 31, 2010.

23          Chabad failed to pay Elite for its video surveillance installation despite the fact

24  that, by late 2009, Chabad owed Elite some $145,000.00 for work completed at

25  Chabad's two sites and at the Yeshiva Ohr facility.  SUF, ECF No. 78-2, nos. 40-45.

26  When Chabad failed to pay this debt, Elite refused to perform additional work and filed a

27  lawsuit to collect the outstanding monies it was owed.  Id. nos. 40-41.  At the time, the

28  majority of improvements to be performed at Marina were incomplete, and no work was

1   ever performed at Bais Chana. Id. nos. 46-47; Marina SUF, ECF No. 78-4, no. 22.

2   Therefore, by August 31, 2010, Chabad was obligated to repay the $272,495.00 total it

3   had either received directly from Cal EMA but not paid out pursuant to the grants it

4   received, or indirectly in the form of monies entrusted to it by its affiliates Marina and

5   Yeshiva Ohr.

6       By letter dated April 23, 2010, Cal EMA advised Chabad of its intent to perform an

7   audit of grant monies paid to Marina, Bais Chana, and Yeshiva Ohr, and to Chabad for

8   its Running Springs and Gayley locations.  SUF, ECF No. 78-2, no. 66.  Thereafter, on

9   November 1, 2010, Cal EMA issued a demand to Chabad for repayment of some

10  $612,066.00, which represented both unpaid grant funds and associated penalties.  On

11  May 2, 2011, Cal EMA issued a revised repayment demand of $598,118.17.  SUF, ECF

12  No. 78-2, nos. 68-69.  In the meantime, Elite and its assignee, Continental Business

13  Credit, Inc., ("Continental") ultimately settled its suit against Chabad and its affiliates in

14  exchange for Chabad's payment of $102,000.00 to Elite and $130,137.00 to Continental

15  in February of 2011.  Id. nos. 40, 76-81.  According to Chabad, that settlement in the

16  total amount of $232,137.00 was in excess of the billed balance due in the amount of

17  $208,136.00.  At no time, however, did Chabad make any payment to Cal EMA until July

18  14, 2014, almost four years after the present qui tam lawsuit was filed on April 30, 2010,

19  when Chabad paid the sum of $136,920.00 for overpayment of grant advances not

20  encompassed by its belated payments to Elite and Continental described above.

21

22                                      **STANDARD**

23

24      The Federal Rules of Civil Procedure provide for summary judgment when "the

25  movant shows that there is no genuine dispute as to any material fact and the movant is

26  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

27  Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

28  dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

1     Rule 56 also allows a court to grant summary judgment on part of a claim or

2    defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may

3    move for summary judgment, identifying each claim or defense—or the part of each

4    claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.

5    Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a

6    motion for partial summary judgment is the same as that which applies to a motion for

7    summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

8    Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

9    judgment standard to motion for summary adjudication).

10     In a summary judgment motion, the moving party always bears the initial

11    responsibility of informing the court of the basis for the motion and identifying the

12    portions in the record "which it believes demonstrate the absence of a genuine issue of

13    material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial

14    responsibility, the burden then shifts to the opposing party to establish that a genuine

15    issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith

16    Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.

17    253, 288-89 (1968).

18     In attempting to establish the existence or non-existence of a genuine factual

19    dispute, the party must support its assertion by "citing to particular parts of materials in

20    the record, including depositions, documents, electronically stored information,

21    affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

22    not establish the absence or presence of a genuine dispute, or that an adverse party

23    cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

24    opposing party must demonstrate that the fact in contention is material, i.e., a fact that

25    might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby,

26    Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

27    Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also

28    demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

1   such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>,

2   477 U.S. at 248.  In other words, the judge needs to answer the preliminary question

3   before the evidence is left to the jury of "not whether there is literally no evidence, but

4   whether there is any upon which a jury could properly proceed to find a verdict for the

5   party producing it, upon whom the <u>onus</u> of proof is imposed." <u>Anderson</u>, 477 U.S. at 251

6   (quoting <u>Improvement Co. v. Munson</u>, 81 U.S. 442, 448 (1871)) (emphasis in original).

7   As the Supreme Court explained, "[w]hen the moving party has carried its burden under

8   Rule [56(a)], its opponent must do more than simply show that there is some

9   metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586.  Therefore,

10  "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

11  nonmoving party, there is no 'genuine issue for trial.'" <u>Id.</u> 587.

12          In resolving a summary judgment motion, the evidence of the opposing party is to

13  be believed, and all reasonable inferences that may be drawn from the facts placed

14  before the court must be drawn in favor of the opposing party.  <u>Anderson</u>, 477 U.S. at

15  255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

16  obligation to produce a factual predicate from which the inference may be drawn.

17  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>,

18  810 F.2d 898 (9th Cir. 1987).

19

20                                              **ANALYSIS**

21

22          The FCA imposes liability for the submission of false claims seeking receipt of

23  federal funds on the grounds that such claims defraud the United States.  31 U.S.C.

24  § 3729(a)(1) (A)-(B).  Liability also attaches under the FCA if a party knowingly conceals

25  or knowingly and improperly avoids an obligation to repay funds to the government.  <u>Id.</u>

26  at § 3729(a)(1)(G).  Here, the Government contends that Defendants obtained federal

27  grant funds by falsely certifying they met eligibility requirement for managing the funds.

28  Moreover, according to the Government, Defendants proceeded to convert the ill-gotten

funds for unauthorized uses and then improperly avoided their obligation to return funds

once the deadlines for their legitimate use had passed.  The Government asserts that it

is entitled to summary judgment because the facts establishing Defendants' liability

under the FCA are uncontroverted, pointing out that the FCA is "intended to reach all

types of fraud, without qualification, that might result in financial loss to the Government."

United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1170 (9th Cir. 2006),

quoting United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).

A cause of action for violation of 31 U.S.C.3729(a)(1)(A) requires "(a) a false or

fraudulent claim  (2) that was material to the decision-making process, (3) which

defendant presented, or caused to be presented, to the United States for payment or

approval (4) with knowledge that the claim was false or fraudulent.  Hooper v. Lockheed

Martin Corp., 688 F.3d 1037, 1047 (9th Cir. 2012).  Similarly, a claim predicated on

§ 3729(a)(1)(B) requires a showing the "defendants knowingly made, used, or caused to

be made or used, a false record or statement material to a false or fraudulent claim."[5]  Id.

Since the prerequisites for liability under both sections are virtually identical, with the

only difference being whether Defendants submitted a false claim or made a statement

material to such a claim, the Court now addresses each mandatory element, and looks

first to those elements as applied to Chabad's conduct in this matter.

### A.  False Claims

As the Government points out, a "claim" under the FCA is defined broadly to

include "any request or demand" for federal funds.  31 U.S.C. § 3729(b)(2).  Both the

grant assurances submitted along with the initial applications for NSG Program funds,

and the drawdown requests seeking advances for vendor payments, are properly

deemed "claims" within this expansive definition since the representations made in those

documents triggered the payment of grant funds.  See United States ex rel. Bauchwitz v.

Holloman, 671 F. Supp. 2d 674, 689 (E.D. Pa. 2009) (holding that an initial grant

---

[5] Because analysis of § 3729(a)(1)(G), as explained below, do not affect the Court's resolution of this Motion, the elements required to demonstrate liability under that subsection are not included.

1   application and subsequent grant progress reports constitute claims because each such

2   document serves as a prerequisite for the release of funding).

3          It is undisputed that in 2008 Chabad agreed with its affiliates in advance of the

4   grant application process that it would handle all aspects of the grant application and

5   disbursement process.  SUF, ECF No. 78-2, no. 17.   Given those agreements, Chabad

6   is responsible for the veracity of the representations made in connection with the NSG

7   Program applications.  One of those representations was that written procedures were in

8   place to provide for control over and accountability for all funds received so that their

9   use, solely for authorized purposes, was adequately safeguarded.  Id. no. 48.  That

10  representation was false.  Although Chabad claims it "adopted" the necessary

11  accounting standards, the evidence belies any assertion that it actually complied with the

12  applicable requirements.  As enumerated above, most of the grant funds received went

13  either directly to Chabad, or were forwarded by the affiliates to Chabad.  Rather than

14  ensuring that the funds were used as intended, however, the undisputed facts show that

15  they were placed in Chabad's general operating accounts and subsequently spent for

16  unrelated purposes.

17         In addition, and perhaps most tellingly, Chabad did not respond to the following

18  request for admission, propounded by the Government in January of 2014, and did not

19  seek relief from the Court for its failure to respond:

20             Admit that, during the period of May 2008 through December
               2012, YOU did not have written procedures to provide for
21             control over and accountability for all funds received under
               the [NSG Program] in order to adequately safeguard all such
22             funds and assure they were used solely for authorized
               purposes as required by 28 CFR § 70.21(b)(3) and 70.22(b).
23

24  Request for Admissions, Ex. 6 to Decl. of Glen Dorgan, ECF No. 79-1, Request No. 16.

25  Thus, pursuant to Rule 36(a)(3) of the Federal Rules of Civil Procedure, Chabad is

26  deemed as a matter of law to have admitted this fact.  See Fed. Trade Comm. v.

27  Medicor LLC, 217 F. Supp. 2d 1048, 1053 (C.D. Cal. 2002) (Rule 36(a) is "self-

28  executing").

1       The deposition testimony of Rabbi Cunin, the individual undisputedly in charge of

2  managing and executing the entire grant process, is equally damning.  Rabbi Cunin

3  confirmed that Chabad never instituted policies to "ensure that the grant funds, though

4  co-mingled with other funds . . ., would not be spent until vendors were ready to be

5  paid."  Cunin Dep., ECF No. 79-2, Ex. 11 to Dorgan Decl., 68:2-15.  Moreover, Rabbi

6  Cunin made it clear that the absence of such policies was not an oversight and

7  conceded that he never planned to safeguard the grant advances and ensure that funds

8  so received were used only to pay authorized grant costs.  Id. at 57:22-58:18, 69:5-18;

9  Ex. 12, 263:20-25 (admitting his plan was to deposit advances in "the general pot" and

10  later pay vendors with a "similar amount of funds" that would "need[] to be found").

11       Chabad places great weight on the fact that it used accrual-based accounting and

12  therefore properly recorded expenses in its books even if those expenses had not

13  actually yet been paid. However, that does not change the reality that Chabad failed to

14  institute any procedure to safeguard advance payments and control disbursements in

15  accordance with the performance deadlines, and to ensure that grant advances were not

16  converted to non-grant uses.  Chabad's claims therefore were substantively false and

17  support a finding of FCA liability.

18       **B.  Presentation of Claims**

19       It is undisputed that Defendants each presented claims for federal grant funds by

20  submitting, through Chabad, the subject advance drawdown requests to Cal EMA.

21  Because Chabad caused its affiliates to present false claims as stated above, it is jointly

22  and severally liable for the drawdown requests it orchestrated on behalf of the other

23  Defendants as well as its conduct in managing its own grants.  The prohibition on

24  causing  another to present a false or fraudulent claim, as set forth in 31 U.S.C. § 3729

25  (a)(1)(B), extends the FCA's reach to "any person who knowingly assisted in causing the

26  government to pay claims which are grounded in fraud, without regard to whether that

27  person had direct contractual relations with the government."  United States ex rel.

28  Marcus v. Hess, 317 U.S. 537, 544-45 (1943), superseded by statute on other ground as

1   recognized by Graham County Soil & Water Conservation Dist. v. United Stated ex rel.

2   Wilson, 559 U.S. 280 (2010); see also United States v. Mackby, 261 F.3d 821, 826 (9th

3   Cir. 2001).

4          Given the broad reach of the FCA in this regard, and the uncontroverted fact that

5   Chabad orchestrated, either directly or indirectly, all of the advance drawdown requests,

6   this prerequisite for FCA liability is also satisfied.

7          **C.  Materiality of Misrepresentations**

8          Because both the NSG Program grant applications and the drawdown requests

9   expressly required compliance with the applicable financial management standards, and

10  because as indicated above those requirements were undisputedly not satisfied, the

11  false certifications made by Chabad were unquestionably material.  The Government

12  has represented that it would not have awarded the grant funds in the absence of

13  affirmative compliance with those standards, and Defendants offer no evidence that this

14  assertion is untrue.

15         **D.  Chabad Acted Knowingly**

16         To establish liability under the FCA for "knowingly" submitting a false claim, "no

17  proof of specific intent to defraud" is required.  31 U.S.C. § 3729(b)(1)(B).  Instead, the

18  FCA broadly defines the term "knowing" to include "deliberate ignorance" or "reckless

19  disregard."  31 U.S.C. § 3729(b)(1)(A)(ii)-(iii).

20         Chabad insists that triable issues of fact preclude any finding as a matter of law

21  that its alleged malfeasance in handling the NSG Program was "knowing" for purposes

22  of triggering FCA liability.  After carefully reviewing all of the undisputed facts and

23  circumstances, however, the Court disagrees.

24         Chabad initially points to the fact that it hired David Sternlight, Ph.D, in 2008 in

25  order to understand the administrative requirements of the NSG program, and argues

26  that seeking Dr. Sternlight's counsel demonstrates in and of itself a willingness to

27  maintain accountable financial management systems that militates against any

28  "knowing" action to the contrary.  Chabad's actions in the wake of very specific advice

1   received from Dr.Sternlight, however, suggest just the opposite.  It is undisputed, for

2   example, that on October 7, 2009, before any of the grant performance deadlines

3   expired, Dr. Sternlight warned Rabbi Cunin, the individual at Chabad entirely responsible

4   for managing the NSG Program grants, that Chabad only had "120 calendar days from

5   the date on the California Treasurer's advance check (not the day it is received) to

6   perform the project installation and submit the final invoice information offsetting the

7   cash advance."  SUF, ECF No. 78-2, no. 61.  To emphasize the importance of this

8   deadline, the next sentence of the email read, in caps, "PLEASE DO NOT FORGET

9   THIS."  Id.  Then, on October 20, 2009 in another email to Rabbi Cunin, Dr. Sternlight

10  reiterated this deadline, explaining that it was a "firm period" and the State "can't give

11  extensions."  Id. no. 62.  Despite retaining Dr. Sternlight to assist with properly managing

12  the grant process, Rabbi Cunin failed to heed his warnings and it is undisputed Rabbi

13  Cunin never told Dr. Sternlight that Chabad had in fact largely "failed to pay any vendors

14  for work performed on the grants at issue after drawdown funds were received and

15  throughout most of 2010."  Id. no. 64.  Dr. Sternlight testified unequivocally at his

16  deposition that had he known this, he would have "reminded [Chabad] in strong – very

17  strong terms that you don't mess with Uncle Sam."  Sternlight Dep., ECF No. 79-2, Ex.

18  15 to Dorgan Decl., 69:15-70:13, 74:19-75:4.

19       In fact, Rabbi Cunin never asked Dr. Sternlight to provide advice after Rabbi

20  Cunin began collecting and depositing the grant advances, and Chabad does not

21  dispute that Dr. Sternlight ultimately had no involvement with the management of the

22  grant proceeds despite being retained being retained to assist with the grants.  SUF,

23  ECF No. 78-2, no. 63.  Instead, proceeding without Dr. Sternlight's involvement and any

24  potential oversight, Rabbi Cunin treated the grant advances as if they were gifts to

25  Chabad that, once paid by Cal EMA, were no longer the "business of the government."

26  See Cunin Dep., ECF No. 79-2, Ex. 11 to Dorgan Decl., 112:8-25 (equating an

27  "advance" with "Oh hi, honey, give me the money."), 65:7-23 (Chabad's "general pot" of

28  money is "not the business of the government").  As a result, and as outlined above,

1  Chabad proceeded to use grant funds to pay unauthorized expenses despite certifying

2  that it had  written policies in place designed to safeguard the integrity of grant

3  advances.  Rabbi Cunin's own testimony shows that on Chabad's behalf he was utterly

4  unconcerned with any such distinction.  The following exchange is particularly telling:

5          Q. . . . I take it's immaterial to you if the bank records
           produced by Chabad of California show grant funds coming
6          into accounts, and then those same accounts showing
           negative balances shortly thereafter, before any vendors are
7          paid?

8          A.  The – let me respond again.  I'm not saying whether the
           accounts were negative or were not negative.  It's not
9          important.  But your statement is basically correct, that it
           makes no difference what's where.
10
   Cunin Dep., ECF No. 79-2, Ex. 12 to Dorgan Decl., 264:3-12.
11

12         This cavalier attitude shows, at minimum, a reckless disregard for administering

13  the NSG Grant Program in accordance with its requirements.   Indeed, given the pointed

14  admonitions provided by Dr. Sternlight in connection with Rabbi Cunin's complete

15  disregard for safeguarding the funds, a compelling argument can be made that Rabbi

16  Cunin, and thus Chabad's, behavior was intentional.  Either way, the facts unequivocally

17  show that Chabad "knowingly" submitted false claims since reckless disregard alone is

18  sufficient to make that determination.

19         While Chabad's counsel argues that the Government cannot show circumstantial

20  evidence of Chabad's "state of mind" and that any such assessment must be left to the

21  jury, Chabad's argument, that the Government must show both knowledge of falsity and

22  intent to deceive to establish FCA liability, is incorrect.  The statute itself makes clear

23  that "reckless disregard" can suffice and that "no proof of specific intent to deceive is

24  required."  31 U.S.C. § 3729(b)(1)(B).  Even the primary case cited by Chabad, Hooper

25  v. Lockheed Martin Corp., 688 F.3d 1037 (9th Cir. 2012) reversed a district court finding

26  that evidence of intent was required, holding that the FCA "require[s] no specific intent to

27  deceive."  Id. at 1049.

28         The undisputed facts in this matter show that Chabad knew about the

17

1   requirements attendant to NSG Program grants in general and to drawdown advance

2   requests in particular, yet had no compunction whatsoever in failing to adhere to those

3   requirements.  Under the circumstances, it is clear to the Court that Chabad acted at

4   minimum "knowingly" as defined by the FCA.

5

6       **E.  Damages and Penalties**

7       Having determined that all the prerequisites for FCA liability under 31 U.S.C.

8   § 3729(a)(1)(A) and (B) are present both with respect to the presentation of a false claim

9   and attendant statements made material to such a claim, the Court finds that the

10  Government has met its burden of establishing Chabad's FCA liability.  Accordingly, the

11  Court must assess the proper amount of damages to which the Government is entitled.

12      In a false certification case, the measure of damages is ordinarily the difference

13  between what the Government paid and what it would have paid had the certifications at

14  issue been truthful.  United States v. Woodbury, 359 F.2d 370, 379 (9th Cir. 1966).

15  Because the Government maintains it would have awarded no grant funds to

16  Defendants had it known that no policies were in place to safeguard grant funds, the

17  Government argues it is entitled to $345,065.00, the difference between the $353,115.00

18  in total grant advances and the $8,050.00 paid prior to submission of drawdown

19  requests.  Once the advances were paid, however, Chabad made additional vendor

20  payments of $71,195.00 before the performance deadlines expired, SUF, ECF No. 78-2,

21  nos. 33-39, which left Chabad responsible for safeguarding $272,495.00 in grant

22  advances not expended before the various performance deadlines expired.  The Court

23  believes the amount of those unused grant funds represents the proper measure of

24  damages in this matter.

25      Although Chabad did make a payment of $136,920.00, which it claimed

26  represented the amount of overpaid grant funds, in July of 2014, that payment was

27  made nearly four years after this qui tam lawsuit was instituted and long after demands

28  for repayment had been made by the government in 2010 and 2011.  The Court finds

1   that this belated, post-litigation repayment should not offset Chabad's FCA liability.

2   Similarly, the fact that Chabad ultimately settled Elite's claim for unpaid invoices by

3   paying Elite and its assignee, Continental, a total of $232,137.00 to settle their lawsuit in

4   February of 2011 should not operate as any credit against Chabad's independent FCA

5   liability.

6       Having determined that Chabad has incurred FCA liability in the amount of

7   $272,495.00 based on its false statements/certifications, the Court need not address the

8   Government's alternative argument that Chabad is also liable under 3729(a)(1)(G),

9   which provides for FCA liability when an entity "knowingly conceals or knowingly

10  improperly avoids or decreases an obligation to pay or transmit money or property to the

11  Government."  The damages sought are duplicative, even though the record is clear that

12  Chabad failed to remit any unpaid funds until almost four years after this lawsuit was

13  filed.

14      The Court's determination that $272,495.00 represents the proper initial measure

15  of Chabad's FCA liability is not the end of this Court's damages assessment.  The FCA

16  provides that any entity violating 31 U.S.C. § 3729(a)(1) is liable for "3 times the amount

17  of damages which the Government sustains because of the act of that [entity]."  The

18  statute makes imposition of treble damages mandatory.  Thus, Chabad is liable for total

19  damages in the amount of $817,485.00.

20      Moreover, in addition to treble damages, the FCA also mandates a civil penalty of

21  "not less than" $5,500.00 for each violation.  31 U.S.C. § 3729(a)(1); see 28 CFR

22  § 85.3(a)(9).  These civil penalties are mandatory upon a finding, as this Court has made

23  above, that false claims were submitted to the government.  In re Schimmels, 85 F.3d

24  416, 419 (9th Cir. 1996); United States ex rel. Rosales v. San Francisco Housing Auth.,

25  173 F. Supp. 2d 987, 1019 (N.D. Cal. 2001) ("In providing for treble damages and

26  mandatory penalties under the FCA, Congress intended a complex mix of

27  compensation, punishment and deterrence.").

28      Here, Chabad either submitted, or caused to be submitted, a total of five separate

19

1  drawdown requests that were based on false certifications.  SUF, ECF No. 78-2, nos.

2  19-23.  Thus, the imposition of five separate $5,500.00 penalties is required for a total

3  penalty of $27,500.00  Accordingly, the Court determines Chabad's total FCA liability in

4  this matter is $844,985.00.

5  **F.  Liability of Chabad of California's Affiliates**

6  While the Court finds that summary judgment is proper as to Chabad, it cannot

7  make that determination with respect to Chabad's affiliates Marina and Yeshiva Ohr.

8  Triable issues of fact remain as to whether Chabad acted as those entities' principal or

9  agent.  Given the fact that the surveillance equipment contemplated was for use at

10  physical facilities actually owned by Chabad, Marina argues that Chabad was actually

11  acting as a de facto principal in arranging for and managing the NSG Program grants.

12  Additionally, as Yeshiva Ohr points out, if Chabad was acting as an agent for its

13  affiliates, there are triable issues of fact as to whether Chabad acted within the scope of

14  that agency.  Yeshiva Ohr, for example, maintains it believed that the grant money would

15  be used to pay vendors, entrusted Chabad accordingly, and had no reason to question

16  Chabad's ability to properly manage grant funds.  Such claims bring into question

17  whether the Chabad affiliates could have acted "knowingly" for purposes of FCA liability,

18  let alone whether the affiliates can be liable for acts performed in excess of any authority

19  they entrusted to Chabad.

20  These issues present triable questions not amenable to disposition on summary

21  judgment, and therefore the Court declines to enter summary judgment against either

22  Marina or Yeshiva Ohr.

23  **CONCLUSION**

24

25  For all the reasons set forth above, the United States' Motion for Summary

26  Judgment (ECF No. 78) is GRANTED IN PART and DENIED IN PART.  The Court

27  GRANTS summary judgment in favor of the Government and against Defendant Chabad

28  of California because the Government has established as a matter of law that Chabad of

California violated the False Claims Act both in submitting NSG Program claims, both on its behalf and in arranging for and managing claims made by its affiliates.  Given those violations, the Court awards the sum of $817,485.00 in treble damages against Defendant Chabad of California, along with statutory penalties in the amount of $27,500.00, for a total of $844,985.00.

The Government's Motion for Summary Judgment insofar as it applies to Defendants Chabad of Marina and Yeshiva Ohr, however, is DENIED.  Given these rulings, and their impact on what remains at issue in this case, the Court vacates both the December 18, 2014, Final Pretrial Conference in this matter, as well as the jury trial scheduled to commence on January 20, 2015.  The remaining parties are hereby directed to file a Joint Status Report not later than thirty (30) days after the date this Memorandum and Order is electronically filed.

IT IS SO ORDERED.

Dated:  December 8, 2014

MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT